Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RODRIGO CHAPA,<br><br>   Plaintiff,<br><br>   v.<br><br>WELBILT, INC., CYNTHIA M. EGNOTOVICH, DINO J. BIANCO, JOAN K. CHOW, JANICE L. FIELDS, BRIAN R. GAMACHE, WILLIAM C. JOHNSON, and ANDREW LANGHAM,<br><br>   Defendants. | Case No:<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Rodrigo Chapa ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

### NATURE OF THE ACTION

1. This is an action against Welbilt, Inc. ("Welbilt" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection

1

with the proposed acquisition (the "Proposed Transaction") of Welbilt by Ali Holding S.r.l. ("Parent"), Ali Group North America Corporation ("Acquiror"), and Ascend Merger Corp. ("Merger Sub," and together with Parent and Acquiror, "Ali").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in this District through the sale of its products and/or services.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff is, and has been at all relevant times hereto, an owner of Welbilt common stock.

7. Defendant Welbilt designs, manufactures, and supplies foodservice equipment for commercial foodservice market worldwide. The Company is incorporated in Delaware. The

Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol, "WBT."

8. Defendant Cynthia M. Egnotovich ("Egnotovich") is Chairperson of the Board of the Company.

9. Defendant Dino J. Bianco ("Bianco") is a director of the Company.

10. Defendant Joan K. Chow ("Chow") is a director of the Company.

11. Defendant Janice L. Fields ("Fields") is a director of the Company.

12. Defendant Brian R. Gamache ("Gamache") is a director of the Company.

13. Defendant William C. Johnson ("Johnson") is President, Chief Executive Officer ("CEO"), and a director of the Company.

14. Defendant Andrew Langham ("Langham") is a director of the Company.

15. Defendants Egnotovich, Bianco, Chow, Fields, Gamache, Johnson and Langham are collectively referred to herein as the "Individual Defendants."

16. Defendants Welbilt and the Individual Defendants are collectively referred to herein as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

A. **Background of the Company**

17. Welbilt, Inc. became publicly traded in March 2016 after a spin-off from The Manitowoc Company, Inc. Welbilt is one of the world's leading commercial foodservice equipment companies with equipment capable of storing, cooking, holding, displaying, dispensing and serving in both hot and cold foodservice categories.

18. Welbilt designs, manufactures, and supplies equipment for the global commercial foodservice market used in restaurants, hotels, resorts, cruise ships, supermarkets, catering halls,

3

hospitals, schools, convenience stores and other institutions. Welbilt's portfolio of "award-winning product brands includes Cleveland™, Convotherm®, Crem®, Delfield®, Frymaster®, Garland®, Kolpak®, Lincoln™, Manitowoc® Ice, Merco®, Merrychef® and Multiplex®." These product brands are supported by three service brands: FitKitchen®, a fully-integrated kitchen systems business, KitchenConnect®, a digital cloud-based application offering, and KitchenCare®, an aftermarket parts and service business. Welbilt operates numerous manufacturing facilities globally.

### B. Background of the Sales Process Leading up to the Proposed Transaction

19. In the spring of 2020, "largely as a result of the COVID-19 pandemic and its impact on the kitchen equipment industry and broader restaurant and food services industries," Welbilt's stock price had declined significantly, closing at $3.50 per share on March 18, 2020 as compared to its closing price on November 4, 2019 of $19.79 per share. *See* Proxy Statement (defined below) at 32.

20. On June 19, 2020, the Board received an unsolicited written proposal from a financial sponsor, Party A, to acquire Welbilt for between $12.00 to $13.00 per share in cash.

21. On July 24, 2020, the Board held a meeting to review management's strategic plan, including changes thereto in light of the COVID-19 pandemic.

22. On July 31, 2020, the Board determined that Party A's proposal was not worth pursuing in light of "uncertainty resulting from the pandemic," and directed Morgan Stanley & Co. LLC ("Morgan Stanley") to inform Party A that Welbilt was not prepared to engage with Party A on the terms of the proposal received. *See* Proxy Statement at 32.

23. On August 6, 2020, the Board received a proposal from Party A to acquire Welbilt for $14.00 per share in cash.

4

24. Over the next several days, the Board determined that Welbilt would be prepared to provide initial due diligence information to Party A if Party A offered $15.00 per share in cash, which message was conveyed to Party A.

25. On August 14, 2020, the Board received a revised proposal from Party A to acquire Welbilt for $15.00 per share in cash.

26. On August 20, 2020, Welbilt and Party A "executed a confidentiality agreement, after which Party A began to conduct due diligence on Welbilt." *See* Proxy Statement at 33.

27. On September 23, 2020, Welbilt entered into an amendment to its engagement letter with Morgan Stanley to provide for the engagement of Morgan Stanley as Welbilt's financial advisor in connection with a potential transaction.

28. On October 1, 2020, Morgan Stanley received an unsolicited call from another financial sponsor, Party B, during which Party B stated they were aware Welbilt was in discussions with third parties regarding a potential strategic transaction.

29. On October 13, 2020, Party A verbally submitted a revised proposal to acquire Welbilt for up to $15 per share, with a $13 per share cash portion and a publicly-traded contingent value right equal to $2 per share, subject to achievement of certain revenue thresholds. This proposal was subsequently submitted to the Board in a non-binding letter.

30. On October 21, 2020, at the Board's direction, Defendant Egnotovich and representatives of Morgan Stanley informed Party A that its proposal was insufficient.

31. Between October 22, 2020 and November 12, 2020, Defendants Egnotovich and Johnson and Morgan Stanley representatives held several calls with Party A, during which Party A verbally increased its offer incrementally. On November 9, 2020, Party A proposed a "best and final" all-cash offer of $13.80 per share. *See* Proxy Statement at 35.

32. In November 2020, the Board determined to continue discussing a potential transaction, including terms, with Party A.

33. On November 30, 2020, Middleby submitted a revised written proposal acquire Welbilt in an all-stock transaction at a fixed exchange ratio of 0.1000, which implied pro forma ownership of the combined company of approximately 20% by Welbilt stockholders.

34. Welbilt countered, and on December 7, 2020, Middleby submitted a revised written proposal with an exchange ratio of 0.1050, which implied pro forma ownership of the combined company of approximately 21% by Welbilt stockholders.

35. On December 13, 2020, Welbilt and Middleby executed a "mutual confidentiality agreement that contained a standstill provision with customary fall-away provisions, after which the parties began to conduct mutual due diligence." *See* Proxy Statement at 36.

36. On December 22, 2020, Party A was sent a draft merger agreement at the direction of the Board.

37. On January 5, 2021, Party C, a strategic company, made an unsolicited inquiry to Welbilt.

38. On January 14, 2021, Middleby submitted a revised written proposal to Welbilt with an exchange ratio of 0.1180, which implied pro forma ownership of the post-closing combined company of approximately 23% by Welbilt's stockholders.

39. Later that day, Welbilt's transaction committee, senior management team, and financial and legal advisors held a meeting to discuss Middleby's proposal, noting that Party A's valuation no longer offered sufficient value to Welbilt's shareholders because Welbilt's stock price was trading higher than Party A's proposed price of $13.80 per share.

40. On January 15, 2021, the Board instructed Defendant Egnotovich and Morgan

Stanley to inform Party A that Welbilt would no longer engage in a transaction with Party A at the proposed $13.80 purchase price.

41. On January 19, 2021, Defendants Egnotovich and Johnson relayed the Board's counteroffer to Middleby, consisting of "a proposed exchange ratio of 0.1285 (which implied pro forma ownership of the combined company of 75.3% by Middleby's stockholders and 24.7% by Welbilt's stockholders), proportionate representation on the combined company's board of directors and a proposed contractual framework that would provide a high degree of closing certainty in any merger agreement." *See* Proxy Statement at 36-37.

42. On January 22, 2021, Middleby submitted a revised proposal with an exchange ratio of 0.1240 (implying pro forma ownership of the combined company of 76% by Middleby's stockholders and 24% by Welbilt stockholders) and noting this was Middleby's "best and final" offer on value. *See* Proxy Statement at 37.

43. That same day, the Board decided to move forward with discussions with Middleby "with a view to seeking alignment on a framework that guaranteed a high degree of closing certainty, as well as post-closing board composition, prior to commencement of due diligence and negotiation of the definitive transaction agreement." *See Id*.

44. On January 29, 2021, Defendants Egnotovich and Johnson called the CEO of Middleby to "confirm that Welbilt had preliminarily accepted, subject to ongoing due diligence and the negotiation of definitive agreements, Middleby's proposed exchange ratio and both parties agreed to continue reciprocal due diligence in order to further refine each party's view of potential synergies and better understand the other's businesses." *Id*.

45. On February 4, 2021, the Middleby board conveyed to Welbilt that it agreed Welbilt would have proportionate representation on the post-closing combined company's board of

directors, which would result in Middleby expanding its board from seven to nine individuals with two Welbilt representatives serving on the combined company's board.

46. Over the following weeks, Welbilt and Middleby negotiated the terms of a merger agreement.

47. On April 11, 2021, the CEO of Middleby notified Defendants Egnotovich and Johnson that each had been "unanimously selected by the Middleby Board's nominating and corporate governance committee to serve on the combined company board of directors upon the Closing, which was subsequently disclosed to the Welbilt Board at the April 14, 2021 meeting." *See* Proxy Statement at 39.

48. Later that month, certain Welbilt stockholders affiliated with Carl C. Icahn (the "Icahn Stockholders") negotiated and exchanged markups with counsel for Middleby of an agreement to vote all of their Welbilt shares in favor of the Proposed Transaction (the "Icahn Support Agreement").

49. On April 20, 2021, Welbilt and Middleby executed the merger agreement. Further, Middleby and the Icahn Stockholders executed the Icahn Support Agreement.

50. On May 25, 2021, Welbilt received an "unsolicited written proposal from Parent to acquire 100% of the outstanding Welbilt Common Stock in an all-cash transaction at a price of $23.00 per share (representing approximately $3.3 billion in aggregate equity value, on a fully diluted basis)[.]" *See* Proxy Statement at 40.

51. On May 28, 2021, Parent confirmed that it had submitted an offer to acquire Welbilt for $23.00 per share in cash. According to Parent press release confirming its offer, Ali Group has "substantial cash on hand" and a "Highly Confident Letter from Goldman Sachs International for new financing to fund the proposed transaction." The Ali Group touted how its offer would not

8

contain a financing condition, that such an offer would have less regulatory uncertainty than the Proposed Transaction with Middleby, and that "[its] advisors look forward to engaging with Welbilt and its advisors to quickly negotiate and finalize a definitive agreement."

52. That same day, the Board determined that Ali Group's proposal constitutes or is reasonably likely to constitute or result in a Company Superior Proposal. Proxy Statement at 40.

53. On May 29, 2021, Welbilt and Parent executed a mutual confidentiality agreement and "clean team" addendum thereto, and Welbilt subsequently provided access to Parent to due diligence information. *See Id*. Welbilt and Parent's representatives engaged in merger discussions over the next several weeks.

54. On July 5, 2021, Parent submitted a revised proposal to acquire Welbilt for $24.00 per share in cash. Over the next several days, Welbilt provided Middleby due diligence information in connection with Middleby's consideration of a revised proposal.

55. Then, on July 13, 2021, Welbilt received notice from Middleby stating it did not intend to propose changes to its merger agreement. That day, the Board determined to terminate the Middleby merger agreement and enter into a merger agreement with Parent.

56. On July 14, 2021, Welbilt and Parent executed a merger agreement. The Icahn Stockholders executed a support agreement.

C. The Proposed Transaction

57. On July 14, 2021, Welbilt and Parent announced they had entered into a definitive merger agreement under which Parent would acquire Welbilt in an all-cash transaction for $24.00 per share. The press release announcing the Proposed Transaction states, in pertinent part:

**Ali Group and Welbilt Announce Definitive Merger Agreement**

*Welbilt Shareholders to Receive $24.00 per Share in Cash*

July 14, 2021 11:00 AM Eastern Daylight Time

9

CHICAGO & NEW PORT RICHEY, Fla.--(BUSINESS WIRE)--Ali Holding S.r.l. ("Ali Group"), one of the largest and most diversified global leaders in the foodservice equipment industry, and Welbilt, Inc. (NYSE:WBT) today announced that they have entered into a definitive merger agreement under which Ali Group will acquire Welbilt in an all-cash transaction for $24.00 per share, or approximately $3.5 billion in aggregate equity value and $4.8 billion in enterprise value. The merger agreement has been unanimously approved by the boards of "We are pleased to announce this agreement with Welbilt and look forward to combining our highly complementary brands to create a comprehensive product portfolio and enhance our global footprint," said Filippo Berti, Ali Group Chairman and Chief Executive Officer. "We have long admired Welbilt's heritage, breadth of products, brand strength and management team, and together we will have an expanded range of innovative products. The transaction marks a significant milestone in Ali Group's history and will position us to better serve our customers and capitalize on attractive growth opportunities. We are excited to welcome Welbilt and its employees to the Ali Group family as we strengthen our global presence and continue to build on our culture of quality and innovation."

"We are excited to reach this agreement with Ali Group, which delivers outstanding value to Welbilt shareholders, provides new opportunities for Welbilt employees and enables Welbilt to benefit from the expertise and resources of Ali Group," said Bill Johnson, Welbilt's President and Chief Executive Officer. "This transaction provides a compelling and certain cash value to Welbilt shareholders at an attractive premium and will create a global leader in the foodservice equipment and solutions industry with a full range of connectable foodservice solutions for our customers. I want to thank each of our employees for their hard work and dedication to the success of Welbilt, which has positioned us to reach this agreement today. On behalf of the Welbilt Board and management team, we are excited to work closely with Filippo and the Ali Group team as we bring our companies together."

In addition, Carl C. Icahn (and affiliates), who owns 7.7% of Welbilt stock, has entered into a support agreement in favor of the transaction.

**Approvals and Timing**

The transaction, which is not conditioned on financing, is expected to close in early 2022, subject to the satisfaction of customary closing conditions, including the approval of Welbilt shareholders. Upon completion of the transaction, Welbilt's shares will no longer trade on The New York Stock Exchange.

Welbilt today also confirmed that it has terminated the previous merger agreement entered into with The Middleby Corporation ("Middleby") on April 20, 2021. Per the terms of the Middleby merger agreement, Ali Group has paid Middleby a $110 million termination fee on Welbilt's behalf as agreed to in the Ali Group merger agreement. In light of the termination of the agreement with Middleby, Welbilt is cancelling its July 21, 2021, special stockholder meeting to approve the Middleby

transaction. Welbilt expects to announce a special stockholder meeting to approve the Ali Group transaction at a later date.

**Advisors**

Goldman Sachs & Co. LLC has acted as Ali Group's exclusive financial advisor, with financing provided by Goldman Sachs International and Mediobanca, and Alston & Bird is acting as legal advisor. Morgan Stanley & Co. LLC is serving as exclusive financial advisor to Welbilt, and Gibson, Dunn & Crutcher LLP is serving as legal counsel.

**About Ali Group**

Founded in 1963, Ali Group is an Italian corporation with headquarters located in Milan, Italy and North American operations based in Chicago, Illinois. Through its subsidiaries, the company designs, manufactures, markets and services a broad line of commercial and institutional foodservice equipment used by major restaurant and hotel chains, independent restaurants, hospitals, schools, airports, correctional institutions and canteens.

Ali Group and its 80 global brands employ approximately 10,000 people in 30 countries and, in terms of sales, is one of the world's largest and most diversified global leaders in the foodservice equipment industry. It has 58 manufacturing facilities in 15 countries and sales and service subsidiaries throughout Europe, North America, South America, the Middle East and Asia Pacific.

For more information on Ali Group products and services, visit www.aligroup.com.

**About Welbilt, Inc.**

Welbilt, Inc. provides the world's top chefs, premier chain operators and growing independents with industry-leading equipment and solutions. Our innovative products and solutions are powered by our deep knowledge, operator insights, and culinary expertise. Our portfolio of award-winning product brands includes Cleveland™, Convotherm®, Crem®, Delfield®, Frymaster®, Garland®, Kolpak®, Lincoln®, Manitowoc® Ice, Merco®, Merrychef® and Multiplex®. These product brands are supported by three service brands: KitchenCare®, our aftermarket parts and service brand, FitKitchen®, our fully-integrated kitchen systems brand, and KitchenConnect®, our cloud-based digital platform brand. Headquartered in the Tampa Bay region of Florida and operating 19 manufacturing facilities throughout the Americas, Europe and Asia, we sell through a global network of over 5,000 distributors, dealers, buying groups and manufacturers' representatives in over 100 countries. We have approximately 4,500 employees and generated sales of $1.2 billion in 2020. For more information, visit www.welbilt.com.

58.     On August 31, 2021, the Company filed a Schedule 14A Definitive Proxy

Statement under Section 14(a) of the Exchange Act (the "Proxy Statement") with the SEC in connection with the Proposed Transaction.

### D. The Proxy Statement Contains Materially False and Misleading Statements and Omissions

59. The Proxy Statement, which recommends that Welbilt shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) the sales process leading up to the Proposed Transaction; (ii) Welbilt's financial projections; and (iii) the financial analyses performed by Welbilt's financial advisor, Morgan Stanley, in connection with its fairness opinion.

60. The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Merger; (ii) Recommendation of the Welbilt Board and Reasons for the Merger; (iii) Opinion of Financial Advisor to Welbilt; and (iv) Certain Unaudited Forecasted Financial Information.

61. Unless and until the material misstatements and omissions (referenced below) are remedied before the anticipated September 30, 2021 shareholder vote on the Proposed Transaction, Welbilt shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

#### 1. Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction

62. The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

63. First, the Proxy Statement suggests that Parties B and C were interested in entering into a strategic transaction with Welbilt, but fails to disclose whether such parties entered into a confidentiality or nondisclosure agreement with Welbilt, including whether such agreements

12

contained standstill provisions with "don't ask, don't waive" ("DADW") provisions (including their time of enforcement) that would preclude such interested parties from making superior offers for Welbilt.

64. Second, the Proxy Statement fails to disclose all relevant terms of Party A's confidentiality agreement with Welbilt. The Proxy Statement specifically notes that Welbilt and Middleby executed a "mutual confidentiality agreement that contained a standstill provision with customary fall-away provisions, after which the parties began to conduct mutual due diligence." *See* Proxy Statement at 36. But the Proxy Statement only summarily states that Welbilt and Party A "executed a confidentiality agreement" without specifying whether such agreement contained a standstill provision with customary fall-away provisions and/or DADW provisions (including their time of enforcement). *See Id*. at 33. The Proxy Statement further fails to disclose whether there is any mechanism or document precluding Party A from submitting a higher offer, which had at one point submitted a proposal to acquire Welbilt.

65. Without this information, Welbilt shareholders may have the mistaken belief that potential suitors are or were permitted to submit superior proposals for the Company, when in fact they are or were contractually prohibited from doing so. This information is material because a reasonable Welbilt shareholder would want to know, prior to voting for or against the Proposed Transaction, whether other potential buyers are or were foreclosed from submitting a superior proposal.

66. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**2. Material Omissions Concerning Welbilt's Financial Projections**

67. The Proxy Statement omits material information concerning Welbilt's financial projections.

68. With respect to the Welbilt's forecasted financial information, the Proxy Statement fails to disclose: (1) all line items underlying (i) Revenue, (ii) Adjusted EBITDA (burdened by SBC), and (iii) Unlevered Free Cash Flow; (2) Welbilt's GAAP operating income; and (3) a reconciliation of all non-GAAP to GAAP metrics.[1]

69. With respect to each set of financial projections for Welbilt, the Proxy Statement fails to sufficiently disclose the underlying inputs and assumptions used to formulate such projections.

70. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

71. When a company discloses non-GAAP financial metrics in a Proxy Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC Regulation G, all projections and information necessary to make the non-GAAP metrics not

---

[1] The GAAP operating income metrics exist as they are referenced in the Proxy Statement. *See* Proxy Statement at 47-48 ("Adjusted EBITDA (burdened by SBC) is defined as GAAP operating income . . .").

misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

72. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3. Material Omissions Concerning Morgan Stanley's Analyses

73. In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Morgan Stanley.

74. The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Discounted Cash Flow Analysis*" for Welbilt: (1) all line items underlying the unlevered free cash flows; (2) the terminal values for Welbilt; (3) the individual inputs and assumptions underlying the (i) discount rates ranging from 8.6% to 9.8%, and (ii) terminal growth rates of 2.5% to 3.5%; and (4) the fully diluted shares of Welbilt common stock.

75. The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Discounted Equity Value Analysis*": (1) Morgan Stanley's basis for applying the multiples used in the analysis; and (2) the individual inputs and assumptions underlying the 12.8% discount rate.

76. The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Discounted Equity Research Analysts' Future Price Targets*" analysis: (1) the individual price targets observed by Morgan Stanley in its analysis; (2) the sources thereof; and (3) the individual inputs and assumptions underlying the discount rates applied.

77. With respect to Morgan Stanley's "*Precedent Premia Analysis*," the Proxy Statement fails to disclose the transactions observed in the analysis and premiums paid therein.

78. The valuation methods, underlying assumptions, and key inputs used by

Morgan Stanley in rendering its purported fairness opinion must be fairly disclosed to Welbilt shareholders. The description of Morgan Stanley's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Welbilt shareholders are unable to fully understand Morgan Stanley's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction.

79. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

80. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

82. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

83. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

84. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

85. Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

86. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

88. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

17

with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

89. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

90. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

91. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

92. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 8, 2021                                Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
           zhalper@halpersadeh.com

19

*Counsel for Plaintiff*